## KRIESAK v. CROWE.

### No. 458 Civil.

District Court, M. D. Pennsylvania.

April 23, 1942.

See, also, 36 F.Supp. 127.

Henry Thomas Dolan, of Scranton, Pa., for plaintiff.

Kelly, Fitzgerald & Kelly, by Edward J. Kelly, all of Scranton, Pa., and Forrest Mervine, of Stroudsburg, Pa., for defendant.

JOHNSON, District Judge.

This is a civil action in which the plaintiff, Mary Kriesak, administratrix of the estate of Lukas Evanchak, also known as Lucas Ivancak, is seeking to recover from the defendant, Montgomery F. Crowe, damages caused as alleged by the negligent operation of defendant's car resulting in the death of Lukas Evanchak. The case came on for trial before the court and a jury and a verdict was rendered for the

plaintiff in the sum of $2,500. The defendant has moved for judgment and, if this is refused, for a new trial.

The facts of the case are briefly as follows: On the morning of June 22, 1939, about 2 o'clock daylight saving time, the deceased was seen lying on the right side or lane of route 940 by the defendant as he was driving his car in the direction of Stroudsburg from Pocono Summit at a point adjoining the property of the Pocono Manor Inn. At the trial, the defendant testified that he was driving a new Chrysler Sedan at a speed of thirty-five to forty miles per hour with his light on low beam illuminating the highway for a distance of 300 feet in front of his car when he saw some thing about 100 feet ahead in his lane which "looked like a pile of rags"; that as he drew nearer he veered to the left to avoid hitting the object; that as he passed the object, Bossard, who was riding in the front seat with him, remarked that it looked like a body lying in the road; that they drove on a short distance and returned to investigate. Having found the object was the body of a man bleeding from a wound about the head, the defendant and his companion left the body as they found it and drove to the Motor Police station at Mt. Pocono to notify the highway patrol of their discovery. About three-quarters of an hour later, according to the testimony of Bossard, they returned to the place where the body was lying, accompanied by Corporal Schwartz of the Motor Police and Dr. David Kohn, a physician. The patrolman testified that upon returning to the scene, the defendant stated that the body had been moved, in their absence, from the place where they first saw it 39 feet in a southerly direction. At a point about 40 feet north of where the body lay upon their return was a pool of blood described by a witness as being 30 inches long and 18 inches wide. Leading in a straight line from the first blotch on the highway to where the body lay were streaks of blood indicating that the body had been dragged along the highway. Dr. Kohn finding life in the body administered a stimulant but twenty minutes later pronounced the man dead. At the place where the body was resting was a second and larger pool of blood.

Witnesses who examined the body testified that the deceased had suffered a laceration of the neck below the chin, a compound fracture of the right leg which was doubled up under his body, various arm and leg bruises and a gaping hole about a foot deep extending from the right groin to the back revealing the shattered base of his spine. The deposition of Dr. Kohn stated that death was caused by these injuries and would have resulted approximately an hour and a half after their infliction or sooner.

The defendant admitted the ownership and operation of the automobile. Corporal Schwartz testified that he examined the defendant's automobile with a flash light on his first visit to the scene of the accident at defendant's request and that he found nothing to indicate any contact with a body. Continuing the investigation later in the morning, about 9 o'clock, he testified that as he was driving to defendant's office in front of which defendant's car was parked he noticed when fifty feet from the car, a piece of cloth dangling from the right front underpart of defendant's car. The car was then taken to a local garage and placed upon a hydraulic lift. At the entrance of the garage a mechanic approached and removed the cloth as the car was being driven in the garage. There was a dispute between the officer and the mechanic from which side of the car the cloth was removed. The mechanic, defendant's witness, testified that the piece of cloth which had been previously offered in evidence was of the same material as that which he took from defendant's car, but that the grease on it was not the same as on the piece he had removed in June, 1939, over two years before the trial. Another officer who had assisted in the investigation of the accident, testified that the cloth found hanging from defendant's car had been compared with the trousers worn by the deceased and that the patch appeared to have come from the seat of the trousers worn by the deceased which were torn in numerous places. The jury were permitted to compare the piece of cloth with the trousers. The other clothing worn by the deceased, offered in evidence, showed numerous tears. In addition to photographs of the blotches of blood and the streaks between them on the highway photographs of the crank case of defendant's car, taken while it was on the lift at the garage, showed that the grease was smeared and looked like it had been partially wiped off. Another photograph showed a smudge of grease on the deceased's skin above the hip.

On cross examination, the defendant admitted that at the coroner's inquest he was asked under oath whether it was possible that he might have straddled the body lying upon the highway and gone on without paying any attention and that his answer had been in the affirmative. Defendant also admitted answering the question, "Did you apply your brakes at the time?" by saying, "I would say so; I'm quite sure I put my foot down". Defendant admitted being asked the question at the coroner's inquest; "Can you account to us how the cloth got on your car?" to which he answered, "The only way I can account for it in trying to avoid the object, we might have straddled it instead of clearing it. We came back in a hurry, there was a lot of torn pieces around, and it might have been picked up by the suction of the fast moving car."

On motion for judgment the following three questions arise: first, negligence of the defendant; secondly, contributory negligence of the deceased, and thirdly, proximate cause of the death of the deceased.

On the negligence of the defendant, it was his duty to keep his car reasonably under control so as to avoid injuring other persons on the highway and to observe what was within his view a distance of 300 feet ahead of his car and to watch where he was driving so that in the exercise of reasonable care he could stop his car and avoid striking the body of the deceased. Therefore, the question of the negligence of the defendant is one of fact for the jury and not of law for the court.

Secondly, contributory negligence of the deceased; The evidence does not show how the deceased came to be lying on the highway. He had a right to use the highway but whether he fell upon the highway or had been previously struck down, the evidence does not show. The deceased was alive when defendant approached him. The deceased is presumed to have exercised care to protect his own life. Under all the circumstances, the question of contributory negligence of the deceased is one of fact for the jury.

Thirdly, the proximate cause of the death of the deceased: There was evidence in the case from which the jury was warranted in finding that the defendant's car straddled the body of the deceased while the deceased was alive; that the under part of the car struck the body of the deceased causing severe injuries to the body which caused or contributed to the death of the deceased.

The above questions may be considered close ones, but close questions are for the jury and not for the court. The court could only decide these questions of negligence, contributory negligence and proximate cause if the facts and inferences were clear. In this case the facts and inferences are not clear so as to permit the court to determine them as matters of law. Since the jury were warranted in their finding for the plaintiff, the motion to set aside the verdict and enter judgment for the defendant, must be refused.

Of the reasons assigned by defendant in support of his motion for a new trial only two warrant discussion. The first is that the damages are excessive. The proof showed that over the period from January, 1916, to May, 1930, plaintiff's decedent accumulated a balance of $2,-659.93 in a savings account. Withdrawals were made from 1932 to 1939 which nearly exhausted his account. The most likely explanation is that this was the result of difficulty in obtaining employment during these years. The evidence introduced by plaintiff tended to show that the deceased's health and habits were good. By the American Experience Table of Mortality, a portion of which was read to the jury, a man of the decedent's age, 46 years, would have an average life expectancy of 23.81 years. In the light of this evidence the verdict of $2,500 rendered for the plaintiff does not appear to be excessive. The defendant also contends that a new trial should be granted because the charge on the measure of damages, permitting the administratrix to recover for loss of earning power during decedent's normal life expectancy, was erroneous. In an earlier opinion in this case this court has already decided that this measure of damages is properly recoverable in a suit by the personal representative where there are no surviving relatives entitled to sue under the Pennsylvania Death Acts, 12 P.S. §§ 1601–1604, double recovery thereby being impossible. Kriesak v. Crowe, 36 F.Supp. 127.

The motion for judgment for the defendant is overruled and the motion for a new trial is overruled and a new trial is refused.